103196 and 103197, F. John Cushing, Administrator of the Estate of Claudia Zabunka, Deceit v. Greyhound Lines, Inc. And I would ask at this time that the lawyers that intend on presenting some oral argument step up to this podium and identify yourselves for the record, please. Certainly. Good morning. Scott DeLincoln for John Cushing. All right. Good morning, Your Honor. Paul Esposito for Greyhound. Good morning, Your Honor. Michael Braddock on behalf of MCI. All right. So that's it for the attorneys. We're going to allow each side approximately 15 minutes for a presentation. Have you two discussed sharing any of that time, or? We haven't, Your Honor, but we'll just do it off the cuff. All right. Well, 15 to 20 minutes, and from that, Lincoln, you may save out some time for rebuttal. Which I would like to do, Your Honor, five minutes. And we're not discussing any fees today. Understood. All right. All right. Thank you. Good morning. May it please the court. Scott DeLincoln for John Cushing. We begin by saying, I don't think I'm overstating it by saying this is an unusual case. Perhaps even extraordinary. What, in my view, is most extraordinary is the significance and consequences of the trial court's errors and the intertwined conduct of a court-appointed GAL and the court-appointed lawyers. And because it's so significant, the relief that we're requesting, which is that this all go back, the orders be voided, and essentially it be returned to the status it was before the lawyers were fired, is the appropriate relief. Maybe the most helpful place for you to start, as far as I'm concerned, is to hear your responses to the issues raised regarding waiver on the silence in response to the announced settlement. Certainly. A couple of answers to that, I think. The first and foremost one is that, in our view, and I think this is the import of the ruling, this court's ruling in 0768, is Mr. Cushing was out. He had been removed for all practical purposes, informally and informally. Although there was no order that said, you're out, that was the consequence, that was the effect, that was the intention. At the settlement conference, was there a statement by the trial judge that he didn't want to hear anything from Mr. Cushing? I don't believe the judge said that, although that had been made clear in so many ways and so many statements leading up to that. I would also point out that the trial judge had announced a week before that hearing that he was approving the settlement. So it was a done deal at that point. But in our view, Mr. Cushing was out. He had no, at that point, no right to say anything. And he wouldn't, it was clear that he wouldn't be allowed to. When you say he had no right, there were several points in the record where Judge Haddad said, he's going to hear from anybody who wants to say anything. That's true. So it wasn't a situation where if, like happened in front of prior judges when other people tried to speak, that he was in danger of being cut off or not listened to in all candor, isn't that right? He was not in danger of being cut off. Was he in danger of not being listened to? I mean, he wasn't going to be heard. He was going to be listened to in that sense, but it was very clear from everything that had transpired up to that point that he had his, whatever right he had to be there, whatever courtesy Judge Haddad afforded him, was purely a courtesy and not in his right as a party to be present and to be heard in that capacity. And I would submit that, you know, it's fine for the judge to say I'll hear from anybody in the courtroom, but that doesn't mean that anybody in the courtroom has anything that's going to be taken seriously or that is even going to have, in the judge's mind, any legal capacity. The other things I would point out about the settlement conferences, first of all, all the conferences that led up to it, Mr. Cushing was not allowed to attend. So what transpired in those conferences, what arguments were made, what theories were presented, what numbers were tossed around, what negotiations were undertaken, how everything was reached, he had no idea about that. Well, how do you characterize or how do you look at the statement that Mr. Cushing made at the October 27, 2009 hearing before Judge Locallo in which he said, if truly the parties are close to settling, the last thing I want to do is to try to stop or hinder that settlement? Yes, and if you recall. That last part was in quotes. Yes, yes. If you recall, that that was right after Mr. Cushing's lawyers all had been fired. He had no counsel at that point. He was given to understand that, in fact, the settlement was close at hand. How soon after that, what time frame are we looking at? Mr. Cushing indicated that. How soon had he, how soon after he had been discharged or released or whatever word you want to use? How many days approximately? Well, it's an interesting question because, as you may recall from 0768, Judge Locallo fired him, later reinstated him, non-pro-tunc, but not to the date he was fired. So, it was certainly less than a month, I believe, from the time all his lawyers were fired that that took place. And he didn't have a new lawyer yet. I was not on that case until December, several months later. So, all Mr. Cushing was saying was, you know, I'm unrepresented. If you think you guys can settle this case, I don't need to attend this, this particular one. He was not making a blanket statement that I don't want to or intend to attend any other Rule 63 conferences after this. It was just that one particular one under those particular circumstances. And, in fact, as the trial court said, as Judge Haddad said, we've had all these Rule 63 conferences you don't even know about, which really is not proper because, and it sort of cements the notion that Mr. Cushing was out because under Rule 63, if you're going to have all these settlement conferences with various parties alone and so forth, you're supposed to get the consent of the parties to do it, of all the parties. His consent was never sought, and as Judge Haddad said, he didn't even know about all of them. So, I don't think it would be proper to say that he waived appearances or waived objecting to the settlements or any of the rest of it because he truly was excluded. And, it's also worth mentioning, I think, that when the settlement agreements were finally signed, it was not his signature line on there, it was the judge signed on behalf of the estate. He was never shown the settlement agreements before they were executed and only found, and I don't even think he saw them until he received a copy sometime past the date that they were executed. So, I would argue that there was no waiver at all because once he was excluded, he really was not let back in and the occasional comments from Judge Haddad saying, happy to hear from everybody, was not seriously an effort to let Mr. Cushing speak as the party he was and should have been. Can you also address the Fouch issue regarding the substitution of judge motion that's raised by the appellees? Forgive me, Judge, I'm not sure what. Basically, it's that failing to include the substitution of judge motion in the record operates to really deprive us of the ability to review the decision on the substitution of judge motion. To the extent it's not in the record, we apologize. I would point out, I don't know why that document's not in the record. We didn't exclude anything from the record when we had it prepared. It was, I think, there's 102, I believe, volumes, so I think more than that. And so, until they pointed it out, we had no idea that it was not in there. I would point out, however, that all of the arguments in their motion or the arguments which appear in Judge Witt's memorandum of law on the subject present all of that information. So, oh, I'm sorry, and Judge LaCowell, of course, addressed what Greyhound addressed. So. What's the relief, though? We don't have a situation where someone came in, alleged cause, the judge was biased, and therefore, and it went to another judge for hearing, and then that judge denied the SOJ. We have the reverse here. We have a situation where the SOJ was, what, well, sui sponte allowed, or I'm not sure, but either way, we have a situation where there is a granting of an SOJ. I understand. I'm not sure what, at this point, is that really alive in light of everything? And we have a judge who granted that who's retired. I mean, it would never go back to that judge, although it, I don't know where it would go, but I'm not sure I understand the viability of this. I admit, acknowledge that this is the reverse of the typical situation, and it's unusual. I wish I could point the court to a case that, in which the appellate court reversed the grant, improper granting of an SOJ, and I wish I could point to the case, to a case where the appellate court assigned on remand the case to a particular judge. What's the impact, or what relief are you really seeking, or what? I'm not sure. Well, here's what we think overall. If this goes back, as we think it should, it should not go back to Judge Haddad. I think that Judge Haddad. Entirely different situation. Right. So should it go back to Judge Zwick? Well, I would submit that it should, for a couple of reasons. Well, I don't know that there's any authority anywhere for this court to be assigning cases to any particular judge. I've seen cases where we've had a request not to have a case go back to a particular judge because of the rulings that the court, that judge had made. But I don't know of any authority or cases that would suggest that we would send this or direct it to go to the judge that was, you know, where the court improperly granted a motion to substitute. So we would send it back to Judge Zwick? I'm not sure about that. Wouldn't you concede that there is really no authority for your position that we should send it back to a particular judge? I would concede the only authority there is, and there's no specific authority, the only authority is the general authority of Rule, I think it's 366, which allows the court to do, to grant the relief that a particular case may require. But yes, no specific authority that says that. Even if you were to, even if you were to persuade us that the decision on the substitution of judge motion was in error, aren't we absent anything else to presume that it would go to a competent judge and that there was no real prejudice or harm from it being removed from one presumably competent judge to another presumably competent judge? I appreciate the point, and here's what I would say to that. There certainly is a presumption that all judges are competent, but then, so again, this Judge Zwick, that presumption applies to her as well. The two things about that I think are, as a sort of prudential matter, and really in terms of justice, considering how long this case has been in the system and where it is, which was before all of what I would call the shenanigans, Mr. Cushing's lawyer stepped up and said we're ready for trial, and there, if it goes back, there might still be an issue about getting Christina the minor psychological evaluation of whether she could testify or not. But the one judge who knew all this stuff from the beginning. Mr. Zwick, at this point, with all the judges who have been involved in this case, and I can't even name all of them from memory, I know it's been Judge Maddox, Judge Locallo, Judge Haddad, Judge Zwick, Judge Pierce has been involved at some point. There's been Judge Leidenweber in federal court. There's been a judge in Colorado. I mean, nobody knows everything that happened in this case, which is, candidly, one of the reasons why it got to be such an unholy mess in the first place. Because while lawyers were bouncing all over the place, there was no single judge who knew everything that was going on at all times. So, why don't we concern ourselves with other issues? Let me first ask a point that if you were able to persuade this panel that the settlement should be voided, what impact would that have on the Colorado case? It's a good question, and I suspect this from what I understand about it. I checked the status of that case, and I think oral argument on the appeal is set for sometime in March, I may be wrong, but it's coming up. My understanding also is that one of the reasons those cases were dismissed was based on the settlement here in Cook County that awarded some money to Mr. Klein and then was used sort of to make a res judicata argument in Colorado. So, although I don't represent Mr. Klein personally, my understanding is that if that reasoning is removed, if the settlement is undone, then Mr. Klein doesn't have that impediment in Colorado. Now, what the court out there will do, I don't know, but I would suspect. Would there be other impediments in Colorado? Other than the fact that there are two wrongful death cases going on or were going on involving one death? I don't know what other legal impediments there would be to that. I mean, as I understand Colorado law, Mr. Klein had the right to do what he did. I think it's worth bearing in mind, too, that the reason that case is in Colorado is because Greyhound moved it to Colorado. And the other thing worth bearing in mind for Mr. Klein's sake is that, again, as I understand it, all of the discovery about Mr. Klein's damages took place in the Colorado case, in other words, Greyhound did its discovery with respect to him in Colorado. So, whatever it ends up being in Colorado, if this gets overturned, Greyhound and Mr. Klein will have to deal with that. But whatever those consequences are, I don't think it should change the fact that the settlements here should not be allowed to stand, both because of the voidness argument and because there's really no way they could be viewed, in my opinion, as being in the best interest of the child, particularly by the process in which they were entered and what was in front of the trial court. And while we're talking about that, let me, I'm sorry. Assuming the settlement stood in Illinois, is Greyhound right that Mr. Klein was entitled to recover in the Illinois case? My understanding of that, again, is probably not, because he didn't have any claims against Greyhound in Illinois. His claims, as I understand it, in Illinois were against MCI, not against Greyhound. So, it does seem unfair, certainly, that Greyhound could use a settlement here, pay him just enough money to be certain that some of the money was coming from Greyhound. You know, MCI had a settlement I think was $90,000, and Mr. Klein got $100,000. It seems to me that the point of that was to make certain that Mr. Klein got enough money that Greyhound could then use that to claim race judicata in Colorado. And that really doesn't seem appropriate when he didn't have claims against Greyhound here in Cook County. And let me turn to the settlement, because it's obviously, in a sense, the elephant in the room is what do you do with the settlement. Our primary position, of course, is that because Mr. Cushing was excluded, it's void. And they're really, depending on how you look at it, I know there was some concern about M.B. being appointed, but if M.B. was appointed as, in effect, his replacement, they did a lousy job and it was still inappropriate, but the real point, I think, is even if you get past that, if you get past voidness and you look at could this possibly have been in the best interest of the minor if that's the appropriate standard, and I would submit to you that based on what was in front of the trial court, what the trial court knew, it couldn't possibly be the case, and let me just point out a couple of things, all of which occurred before the settlement, either before it was agreed to or before it was finalized. So, Mr. Cushing had been removed, his lawyers had been removed, there had been a special administrator improperly appointed, there were real conflicts of interest. One of the things that concerned Judge Haddad properly was conflict, and he was concerned about conflicts between Mr. Klein and the minor, Christina, but Mr. Novoselsky, who was the court, one of the court-appointed attorneys, had in fact represented Mr. Klein before he represented Christina, and in fact was still apparently appearing for him in the probate division. So, that was, at least should have been in Judge Haddad's view, a real conflict, not a pretend conflict. The indicia that something was amiss about all this was pretty clear. Greyhound's lawyer, early in the case, had gone over and joined Mr. Novoselsky, and in fact eventually filed, I think, at least two pieces of paper, one in the trial court and one before this court in the 0768 appeal on behalf of Christina. Greyhound never objected to that. Mr. Novoselsky joined in the motion to remove Judge Zwick, even though the point of the motion was that Judge Zwick was biased in favor of their side and against Greyhound's side. In the federal court case, Mr. Novoselsky, before he had been appointed as the lawyer for the estate or for Christina, claimed in the federal court filing that the defendants had agreed to meet and discuss settlement and compromise of Plaintiff's cause of action. How could that be? He wasn't even in the case yet. He filed these malpractice and abuse cases which served only to undermine Christina's case and also the estate's case by undermining Christina's credibility in the event she ultimately were to testify. Mr. Govins, who was the court-appointed GAL or the at-will GAL, he assisted Mr. Novoselsky in trying to get interrogatory answers in that case. The problem with that, of course, is that undermined Christina's emotional distress damages by blaming it on something else and undermines her credibility. You have lawyers and the court-appointed GAL who in open court in front of defense counsel attack the charge that they were tasked with representing. Mr. Cairo, who was the other lawyer, called her, in essence, a congenital liar. Mr. Govins and Mr. Novoselsky both opposed having her re-evaluated by a psychiatrist to determine if she was now able to testify and then supported having her testimony barred and having her claims dismissed because she wouldn't testify. So it was sort of wholesale abandonment of the child's interests in the whole process, leaving aside the numbers, and I would suggest the court doesn't even need to consider the numbers themselves, the amounts, even though those, of course, were considerably less than they were by two respected settlement judges earlier, the numbers they were considering when Christina's skill was not going to be allowed to testify. Those numbers were from 8 to 10, though. They varied from 5 to 8 to 10. Mr. Novoselsky himself had come in and said, there's no point in doing this if we don't have the excess carriers here, and that number started, I think, at 5 million. And both the GAL and the lawyers were unprepared. They didn't know the case. They left out critical information. Is it true that there was a punitive damages claim pending? It wasn't discussed at the settlement. No, and I'm going to apologize. I think I referenced that in my brief, and that is incorrect. I apologize. There was willful and wanton in there, which the effect of which, as I understand it, would have been that if the jury had accepted that Greyhound's actions were willful and wanton, they could have decided that there would be no contributory negligence, which could have made a big difference, because the whole point, it seemed to be from Mr. Gubbin's presentation, was that this was a contributory negligence case, but it really wasn't, and so that kind of approach to it and the failure to understand this, you're not going to, as the computer folks say, garbage in, garbage out, and I think that's what we ended up with here in terms of the settlement. So, I would suggest the numbers don't make sense, but the way those numbers were achieved, even if you were to get past voidness, don't support that this is an appropriate settlement for either for the estate or for Christina. And I'm not sure, I just point out besides the punitive damages, there's a willful and wanton issue, some of these key facts that were omitted and apparently not known by the GAO and counsel were there were witnesses regarding survival, there was a survival count, and the presentation suggested there was no evidence of survival. Well, in fact, there was evidence of survival. There was no discussion, I don't think, of the driver's history of bad conduct, similar bad conduct within the past couple of days. Grayhound's own report blamed the driver, and there's a stack of evidence that simply fell by the wayside when all this was being done, and it was never discussed in the settlement presentations. I would also point out, by the way, the settlement presentations were not let's approve the settlement, they were really, particularly the Grayhound one, good faith one. In other words, it was let's let MCI come in and make certain that this is a good faith settlement in terms of MCI, rather than is it the best interest of the child all the way around. So, the nature of that hearing was not the sort of hearing that everybody typically would be allowed to stand up and speak and make their points. Any other points you would like to make at this point? No, I appreciate your patience, and as I said, I'll reserve a couple of minutes. Thank you. Thank you. Good morning, and may it please the Court, I'm Paul Esposito for Grayhound. Let me start off by going to Your Honor, Judge Epstein's question about waiver. The answer we heard was that Mr. Cushing did not have a lawyer, and so wasn't able to participate in the settlement conferences. In the supplemental record, volume six, starting at page 1329, Mr. Cushing was in a discussion with Judge O'Connell and the attorneys as to who should participate in the settlement conference that was going to be held in the fall of 2009 involving insurance adjusters and all that, and there's a question that, you know, we didn't want to get in a fight and plaintiffs about, you know, who's in charge here, and Mr. Cushing yields. Mr. Cushing says this, he's talking to Judge O'Connell, and again, Judge, I have an attorney that's ready to get involved in the case. I believe I could have someone here, but again, I think that I don't know how that's going to foster the possibility of a settlement at this moment, and Judge O'Connell says, I understand, I agree with you. That's at page 51 of that particular transcript. Was he in at that point? He had never been out. Well. He had never been out at that point. Well, he hadn't been out at that point? He was not out at that point. He was out at some point. Yes. This is. And we've already had our first opinion on this case about what's being potentially displaced, but that day was before Judge Lockello had removed him? Judge Lockello removed him by mistake and corrected it within two weeks. I think he said it. When these remarks were made, what period was this? When he hadn't realized he made the mistake yet, or he had not corrected the mistake, or was it after he had said, I made a mistake and I'm going to put you back in to this date, but not the date you were originally in? What period was that? It was that, and it was, he had made the mistake, he had realized the mistake, he had already corrected his mistake for over a month. The date of this is October 27, 2009. This is in the transcript that the court referred to. I understand. Yeah. On that. May I ask something of a different question? Sure. At this settlement conference, who represented the estate? At the settlement conference, the really, well, I can tell you. You're having difficulty on this one, I understand, because I know Mr. Govins was there on behalf of the minor child, and presumably people were there for, well. Everyone was there for everyone. People were there for everyone. Nobody was there for the estate, was there? Here's the issue, Judge, and this is, and I think this is a guiding principle. I think this court is kind of, not the court, the case is kind of going off in the wrong direction. Well, it wouldn't be the first. No, it wouldn't. What happened is that in June of 2010, Graham put money on the table, put $2 million on the table. How that money got on the table, in other words, if it was Mr., if it's negotiation with Mr. Govins, if it was negotiation with Mr. Cushing, if it was just a matter of Graham waking up one morning and said, I'm sick of this case, I'm paying too much money, here's $2 million. At that point, Judge Haddad's obligation was triggered. Judge Haddad's obligation was under will to determine whether that number was true. Which I'm sure we will. I understand that there may be some difficulty answering my question, but who represented the estate? At all times, John Cushing represented the estate. But he wasn't in the settlement conference. He wasn't in the settlement conference, he was at the settlement hearing. So, wait, he was, is it your position now that he was representing the estate? The only way I can explain it is this, John, the probate court appointed Mr. Cushing as the supervised administrator of the estate of Claudia. That appointment had never lapsed, had never been changed. What happened here was Judge Haddad, and we, you know, this was the first appeal. You know, Judge Haddad said, you know what, I think we need someone who's going to be willing to hold this money if this case settles. And he put, he put MB financial in, not expecting MB financial to be involved in settlement negotiations or anything. I think that court even says that. Holding. Yeah, they're holding money when the settlement came. So. Who was representing the estate? Who were the attorneys representing the estate at that settlement conference? It would have been Mr. Golinkin and Mr. Cushing. They were there. They were at the settlement conference. They were at the hearing at which the court was deciding whether accepting this money was in the best interest of the minor. You know. We don't just have the minor here. Now, this is a global settlement, is it not? Well, that's your client's position, right? Our position is we're putting out money to settle this case. But wait, isn't this your position, as you've asserted in Colorado, that this was a global settlement of the entire universe of claims against your client? Absolutely. Don't you usually need lawyers there to represent all those parties? And we weren't, we weren't. I don't mean, I don't mean Greyhound. Greyhound participated in the conference. But don't we need lawyers representing all the parties to be heard at the conference, to fully participate in order to say that it was a good case settlement? But, but they, but they were. I mean, but they just never, in other words. Mr. Cushing and Mr. Golinkin were there, and they were fully participating in this global. They were, they were fully entitled to present. But we have to, we have to. They were fully entitled. They weren't necessarily doing anything. Maybe, maybe this is where we have to keep the, keep the distinctions clear, Garner. There's kind of two phases to this whole thing. One is, how is this money going to get on the table? That's, that's our decision. That's Greyhound's decision. The issue we're trying to get to. Sure. Before the money got put on the table, there were discussions between the lawyers, the pros and cons, and how much should go on the table, and what the possible defenses were, and all of that. That's before it got put on the table. Who was there for the estate when that discussion was taking place? Probably no one. There's no one that I know of. But they. Isn't that a problem? No. I mean, I see in your brief that you basically say that we should ignore any of the procedural issues that are raised, and instead just look on whether this was a fair settlement.  Yes, it's exactly the position you take. Can you tell me some authority in any case precedent for that position? Because I really couldn't find anything in the brief. The authority is, just, I've never had an appellate court case yet where a case that's settled is discussing issues that were raised during the context of the case. So we need to look at the issues. It's the participation and the representation of parties in the settlement creation. And we haven't even gotten to the issue, which I want to talk about, about the removal of the plaintiff's lawyers under these circumstances. But tell me why we should, in a sense, ignore those procedural issues and focus solely on whether we think this was, this number was a fair number. Because it was our number. Because we didn't, we were not. Well, if your numbers controlled it, you wouldn't need the assent of anybody else, would you? No, we need the assent of the court. We don't need the assent of a guardian ad litem. We don't need the assent of an administrator. We need the assent of a court. An administrator, a supervised administrator is not going to tell Greyhound how much money they have to put on the table to settle a case. If they don't like $2 million, fine, we'll try it. That is our decision. The next decision is up to the court. There's a number on the table, $2 million. Is it, should the minor, in the best interest of the minor, should that number be accepted or should it be rejected? We don't need governs. We don't need pushing. We can put on whatever we want. But you took the position that not only was the minor's case settled, but also Mr. Klein's case was settled. And that's based on will. Well, let's then move our discussion to will. Would you agree that the position that you're taking now, Mr. Esposito, justified or unjustified is an expansion of the will and the ought decision in the sense that the facts under which both of those decisions were rendered were when an interested party, that is a potential beneficiary or family member there, was standing in the way of or objecting to a settlement and the court appointed someone as a neutral to make a determination and represent the minor and assert a recommendation to the court whether the settlement was or was not in the interest of the interested parties. This case is different because here there was a neutral already in place, Mr. Cushing. And in this situation, basically the people who were appointed were appointed to represent the interests of the individual potential beneficiaries. I will agree, Your Honor, that the case here is not on all fours with the case there. That I agree. It's not on all fours with any case, is it, really? Well, it's true it's not on all fours with will, but, you know, we don't. The potential scenario here is probably unlike any of us have ever seen. Hopefully, otherwise, yeah. But the guiding principle is still the same. There's an offer. The defendant in that case, like the defendant in our case, had a settlement offer. Now the judge has to decide what do I do with the settlement offer? And will says, I'll tell you what you do with it. You hold a hearing in which you're looking at the positions of the parties, you're looking at the desires of the parties, you're looking at the strengths and weaknesses of the case, you're looking at the value of the case, you're looking at the probabilities of the success, and you're deciding is accepting that number or rejecting that number in the best interest of the mind. Well, you don't see this as an expansion whatsoever on what will or ought to do. No, I, no. I think that we should apply will or ought, even though there was already a neutral in place, and that, no, because this case is, this case isn't about the powers of a special administrator, a supervised administrator, which is what Mr. Cushing was. It's not about the powers of the guardian. I mean, those, those things come up. But what this case is about is whether the judge who, we have to remember, the child here was the court's ward, not the administrator's ward, not the guardian's ward, not the GAL's ward, not the attorney's ward. It was the court's ward, and the judge had to decide, what am I going to do with this settlement offer? Greyhound has just put $2 million on the table. May I ask an unrelated question to that point? You, at some point, your client asserted a conflict of interest, but one of the lawyers involved in the case on the plaintiff's side did not. Is there a reason you remained silent when your own prior counsel signed pleadings on behalf of the plaintiff after he left the employee? First of all, maybe we can back up. And the court needs to know this if you don't. There were two different firms representing Greyhound, and apparently, we took over this case, we mean Clauston Miller. And later. Shorter was not with your firm. No, Shorter was never with our firm. We didn't know anything about it. Apparently, Mr. Nowoszewski hired him, and apparently, he signed something, this is my understanding of what happened, signed something in a probate court pleading, and when they realized that he had signed it, the pleading was withdrawn. That wasn't any of our doing. I'm not saying it was your doing, but wouldn't it follow that if you were concerned about potential conflicts of attorneys, that that would raise some type of an intent to say, well, you know, on top of any other conflicts we think exist, here's a good one. Guy represented our client for five years, and now he's signing pleadings on behalf of the plaintiff. Well, to the extent that we even knew about it, Your Honor, I don't, to be honest with you, I don't see that anywhere close to a situation where a plaintiff's attorney has now taken in the plaintiff minor for anywhere from nine to 16 months. That's the issue. Let's talk about that, because let's start with the concept, and tell me where my thinking is wrong on here. I'm sure you have an opinion on that, and I genuinely want to hear it. There's a circumstance where you have, for example, a five-year plus long litigation, and you have clients and lawyers, and the lawyers are going to have ongoing contact with their clients over those circumstances. That happens in literally every case. And so there will always be a position where the lawyer will have gained insight and knowledge as to the physical condition, the mental condition of their client during the course of the case. Obviously, they're not conflicted because of that, nor are they subject to having their deposition taken on that. In essence, what this disqualification raises is that if on top of having innumerable conversations and spending hours and hours and hours with their clients over the course of the litigation, if the client for a period of time resides with the lawyer, somehow the rules that would protect the lawyer from becoming a witness disqualified and being deposed is lost. That is, in essence, what the disqualification was based on. Is there any authority for that? I believe the authority comes from the fact that by putting yourself in that position, when the lawyer puts herself in the position, she can become a material witness in what was the personal observations, not from a professional attorney-client standpoint, but from a living arranger, taking care of the child at home, feeding her food, getting her to school, doing all the things that a mother would do for a child, a father would do for a child. You've now changed the entire nature of the relationship. And so, she becomes charged now with all sorts of knowledge. She's taking Ms. Stevens, taking her to doctor appointments. These kinds of things. Lawyers don't do that. I've never heard of a lawyer that does. So, the question is then, at what point does her knowledge become relevant to the case? Remember this, Judge. Our first motion was not to disqualify Ms. Stevens. It was to depose her. We didn't seek immediately to disqualify her. We seek to depose her. To depose the opposing lawyer based upon knowledge gleaned from the contact that she has had with her client over a period of time would be frivolous, but for what you say changes the relationship, which is that for a period of time that the child resided with her. And so, basically, if I'm right, and if I'm not, please explain to me where I'm wrong. At some point, either just because the child moved in with her, or at some point during the period of time that the child was living with her, we should find as a matter of law that the relationship somehow changed, and you would be entitled to depose her. I don't think you need to find any of that. Because we're all going to focus on the amount of the assembly. No, not only that. I think those kinds of things were relevant to the issue of the removal and the substitution of judges. It wasn't, I don't think that this court needs to start writing counsel or. No, no. And when Judge Wick was removed, that was all part and parcel of this whole issue. But is it also, I mean, if we can figure out why the attorneys were removed in the first place, didn't that figure into it in some way in your supposition? The attorneys hadn't been removed at the time. No, not that time, but at a later time. I'm missing, I just missed the thread of what you're saying. How did the case go to, well, was it Judge Elrod who put it at about 8th, 10th? When a punitive claim was still in the case. There was no, I don't believe that was in the case at all. That was the basis of the punitive damages. And punitive damages were dropped. You're saying that was out? That was out. Yeah, this was a negligence case at the time of the settlement. There wasn't any count of billing? I don't think so, no, no. So, we'll have to, you know, check with Mr. Glinken about that. But you're saying that when Judge Elrod suggested this figure of 8th to 10th, it was because there was a request for punitive damages based on Wilklin-Waughton misconduct of Greyhound? Right. All right, and then there was another judge at some point who put a figure between 5 and 6, or was it 6 and 8, and who was that judge? Another judge, I'm just trying to, I don't know, recall any other judge who did that. Well, there's something in the briefs about these figures, and so, anyway, so. I think there was a statement that was being cited that Mr. Novoselsky was saying that I wouldn't let the case go for under 5. I think there was that statement. I don't remember any judge other than Judge Elrod being involved. So, anyway, you put your $2 million on in June, and then when did the actual settlement come to fruition? It was 2.1, right? When MCI kicked in $100,000. So, it went, yours never changed? No, we were $2 million. It's out there? It's stuck? Right. Okay. So, how many months did that take? We put our $2 million in June. The court had a hearing in June, on June the 10th, I believe it's on Good Faith. Yes. And then I think it was August, like August 20th, 22nd, something like that. The same year, though? Oh, the same year, right. So, a couple of months, and your offer really never even changed, and that was. We, we. Is that routine? We've already been found to be in Good Faith. I'm just saying, is that routine? You come up with an offer. Right. You've got a global settlement, you've got an estate, you've got a minor, you've got Mr. Klein. You didn't come up with a dime more, and it all went away. And the other side, you said it's fully participated. What were they doing? Why didn't they try to get that up at all? Why didn't it ever go up at all? Well, I think they probably tried to get up. You got your $2 million out on the table, and it never even changed. I mean, that's not really the normal pre-trial conference settlement discussion where you put up your $2 million, and it ends up, never changes, two months, three months later, it's all done, nice in a package, 47% went to the attorney's fees, or no, wait, 47% went to the minor and Mr. Klein, 43% went to all the fees and the costs. That was it. Well, you know, you can't say it didn't change. Back in November of 2009, again, before Mr. Cushy was out of the case, there were settlement discussions. I believe Greyhound put a number up on the table. Yeah, but it wasn't $2 million. No, it wasn't. It was less. It was less than $2 million. It was less. And then Greyhound withdrew everything in April of 2010. This is because of the problems there were in getting Christina's deposition and her refusal to comply with Judge Haddad's order to be deposed. Judge Greyhound withdrew it. At that point, there was zero on the table. But we have another unusual situation in that the lawyer, and not from your firm, not from your firm, but from another firm had been representing Greyhound for five years, now employed with an attorney appointed by the court to represent. I'm not sure. Well, the only thing I know that he did that infiltrated him. That infiltrated him was that probate document you're talking about. But the fact of the matter goes back, and this is ultimately where the court has to look, we believe, there's $2 million on the table. Now, if they don't want to take it, I guess we go to trial. If you go to trial, the lawyer who had taken and been present at 55 depositions and 17 evidence depositions had been removed. And that lawyer was removed without notice or hearing or attempt or opportunity to be heard, right? Well, I suppose you can say that. Well, she tried several times to address the court and was told several times that she had been removed. At least she had no right to address anybody. Right. Judge, doesn't that, I know you have a party to represent here and you're doing a wonderful job sincerely on it, but doesn't, isn't that the least troubling? No. No. It's not because, it's not troubling to me, number one, because it's not an issue we cause. Number two. Well, I'm not saying you cause it. I understand. There's a co-responding decision to remove those lawyers and not give them a chance to respond. But based upon what had come in front of it. I mean, Judge Locallo did not just wake up one day and remove these attorneys. Judge Locallo had been having hearings in this case. And Judge Locallo had been told about the situation of what had been reported. I have. Hadn't those all been sort of aired out multiple times in front of Judge Wick and didn't she transfer the case out multiple times for petitions to remove her for cause and for whatever? Those weren't aired out. That's what got us in trouble with Judge Wick, as far as we're concerned, because we brought it to the attention. After the judge denied our motion to disqualify. I was saying there weren't multiple motions filed requesting an SOJ from Judge Wick. There were, but they weren't on this subject. No, on another subject. Yeah. Related to the case. Yeah. Made known for being prejudiced. Yeah. Mr. Novoselsky made a number of them. But what happened here is after she, Judge Wick, denied. So you had both the, one of the plaintiff lawyers and the defense lawyer, one of the defense lawyers, both saying that the judge is prejudiced against them. Who's left? Our, just so your court understands. We said the court was prejudiced. After we learned information that was supporting our position, that Ms. Stephens should be removed. And we brought it to the attention of the court in a motion to reconsider. At that point, Judge Wick wrote an opinion saying, and not looking into the allegations that were brought, but saying, you know, this looks, this is a plan here. And this, this, this saying that Ms. Stephens is, should be disqualified. Looks like, it looks like it was deliberate and by design to create a fraud that, that we said, wait a second, we had nothing to do with this. We didn't create those, those interviews. I don't think anyone is suggesting that, Mr. Eskens. But, but the, but the, but the point is when it got to Judge Lockello and Judge Lockello was having the hearings before he disqualified anyone. He said, I find this whole thing very, very troubling. He turns to Leahy and Holstein, who was one of the attorneys at, at, at, at the hearing. And he says, you've got allegations here that this child is being mistreated. Who's bringing that to the attention, Mr. Leahy, but to Judge Zwick, whose, was, whose child was. That was the allegation made in the malpractice case that was later dismissed. I, I suppose so, but the, but the question, but, but Judge, Judge Zwick had a question. He didn't know that, of course he didn't know that, because as I said earlier, you had so many judges doing so many different parts of the case that it would be very difficult for any judge to know it. Anyway, what else would you like to tell us? I want to make one point about, about the, about the going back to the settlement hearing. The good faith hearing, and, and encouraging the court to read the transcript that we attached to our brief. But I want to make this one point. It's the last point to make it to this. Mr. Cushing, after being given three times the, to say something, on the record or off the record, says, Judge, who would listen to me? I'm going to tell you who'd listen to him. We would have listened to him. Graham had $2 million on this table, and a case that he was sick and tired of paying huge amounts of monies for. We would have listened to every single word he said, in the hopes that we can explain to Mr. Cushing why the settlement wasn't in the best interest of the minor, why he should go along with it. We were deprived of that. May I ask if, if the, I'm sure legal fees are always a concern. But in this particular case, why was it that, that Greyhound opposed the attempts to have the Colorado case sent back to Illinois, where it could all be put at least in one case, in front of one judge? You folks removed it to federal court, and then, and it's transferred out to our state. Right. And if, you know, again, we weren't involved in the case. I don't mean personally, I mean as a representative of the court. And frankly, your honor, if I could have done anything in the Colorado case, I wish someone would have been there to see that Mr. Klein filed something without authority. He wasn't the executor, as you know. There wasn't an estate open, as you know. And someone, I wish, would have been there to say, this case not only shouldn't be in Colorado, it shouldn't be in Illinois, because of the past quality. But it, but I can't explain to you why it wasn't done, but it wasn't done. All I can say to you is, we know from our handling of the case, that the fees were monumental. This case was a huge liability. And if I could just say, there is, as we look at this morass, I don't want you to think that I'm saying you can all put it at the feet of any one individual, lawyer, plaintiff, defendant, or judge. This is just an incredible series of events that created one of the most unholy messes I've ever seen. And I don't want, from the questioning that I've given to you, to give you an impression that somehow I'm blaming you, or Greyhound, or anyone else for all of this mess. I understand that. You know, at the end of the day, your honor, you're going to have to come back to something that's really important. There's two men on the table. This child was the ward of Judge Haddad. And Judge Haddad had to make a decision as to whether accepting that $2 million was in the best interest of the minor. The record that's in here, the transcript that's in here, shows that the judge bent over backwards to accommodate everyone's interest. He made a decision. You're looking at it from a point of view of an abuse of discretion, and there was no abuse here. Sure. At the conference, there was some discussion about the Ms. Zabunka, Claudia's contributory negligence. Right. Yeah. Who was that? Ms. Zabunka, the evidence will show, ran out into the street. This was not an accident that happened at the terminal. She was trying to get back on the bus. She was trying to get back on the bus. The passengers were en route to Chicago. Right. She had been told. See, what's happened here, Judge, is. She had been told to be back on the bus at a certain time. Right. She had been told that he was, the driver, Tatum, was going to take the bus away to a service station to get the bus serviced en route to where they were going. And the evidence would be that she had been told that twice, and there were witnesses who confirmed that story. So he was leaving, and she ran out into the public street. After having been told about this. Wasn't she running to get onto the bus that she had been on? Apparently, she was trying to. She was piling on the bus, according to her. Wasn't this a stop, and all the passengers got out? All the passengers left. They were waiting for the bus to be serviced so they could get back on to get back to Chicago. So, I mean, is there a dispute about that? That she hadn't paid for a ticket and wasn't a passenger on the bus? Oh, no. There was nothing like that. So she was a passenger, and she was with her six-year-old daughter, and she was running to get back on the bus before it left. Right. So let's get back to now, what was her contributory negligence that came out during the discussion? Her contributory negligence was that after having been told twice by Mr. Tatum as to what the plan of action was, she, when no one else was, you know, there's no one on the bus. Every, all the passengers were in there eating. She was eating. They were, as a matter of fact, I mean, the testimony from Tatum will be that he was standing in line with her while they were getting food at this bus. Let's get to the accident. The accident was that she ran out in the middle of the street to chase the bus stop, to stop the bus, to get on the bus. Okay. So she ran out in the street? She ran on the street. To catch the bus because she was a passenger. Right. There's, according to police officers' deposition, if she had survived this accident, she would have been ticketed for her conduct. For going out into the public street. Right, right.  To get the bus. To get the bus. To stop this bus. To get on. To stop it because she was a passenger. To stop it, to get on for whatever reason she wanted to get on. There's, there's. What do you mean for whatever reason? I thought she was going back to Chicago. The bus, I think, was going to be serviced. The bus was going to be serviced. This was before the service. Right, yes. This was before the service. You're right, you're right. Yeah, yeah. Okay. That's, that's, that's it then. All right. All right. Thank you. Please, of course, Michael Branson, I'm back with MCI, MCII, thanks for your patience. I, I, it's fine, your honor. I didn't concede to Mr. Esposito as much time as he needed. In fact, I have a sore throat and I always enjoyed hearing Mr. Esposito speak. MCI's position in this case is extremely similar, also to Greyhound's, so I don't think there's a need to rehash all the territory that, that Greyhound went over. One critical factor, though, that I think is in MCI's position that Greyhound doesn't have is, and I just make sure the court understands, any liability that MCI had, that MCI had, was extinguished by a bankruptcy. And the only money that would be available to any of the claimants, the estate or, the minor's estate, would be from insurance policies that were in effect at the time of the incident, those insurance policies provided for a $2 million SIR. So, if either the estate or the minor were successful on any claim against MCI, it would first be subject to a $2 million SIR. Additionally, there'd be setoffs for any, any money that would be obtained from Greyhound. So, for example, if we look at this situation, only for MCI, if Greyhound settles prior to trial for whatever money, the estate or the minor's estate would have to exceed the sum total of that in order to get any of those insurance proceeds. And how does that figure, respectively, how does that figure into the issues that are before us at this point? Well, I think it goes into the, the, the justification for the amount of the settlement, Your Honor. You know, the settlement amount is $90,000. I didn't, just to make sure that that's not inordinately low, that, that takes into account the fact that if Greyhound's settlement of $2 million was up to be, if that was their settlement, they would have to exceed $4 million before they would start seeing any, a $1 from anyone on behalf of MCI. And just, because on, on, just on its face, when you see $90,000, it just strikes one as being rather low, but that's why. And secondly, the second issue, why, why it is always because of the nature of the claims, the product liability claims against MCI, yes, Your Honor. But it is MCI's position that the settlements were in good faith, they should be upheld. During Mr. Esposito's discussion, let's talk about the settlement conference. Just to make sure the Court understands, the settlement conference was, it was done over a period of time. I mean, the settlement discussions lapsed over a long period of time. It wasn't just one sort of mediation session or a series of talks between, you know, at one time. It was, it did span over a period of time, a number, a number of different sessions. But, but isn't it true, though, that the, the $2 million, I'm not talking about your $90,000. Yes. The $2 million was announced on the, you know, using the terms on the table in June. And then you're saying there were, you know, discussions ongoing and ongoing. And then a few months later, there's a settlement. But the, the $2 million figure that was apparently ongoing and ongoing and ongoing and ongoing is the same figure that it started with in the June when it was put on the table, so to speak. And I'm not talking about your $90,000. I don't know, you know, the date that you came up with the 90. And I'm not really talking about MCI, but I'm talking about the $2 million. So these discussions, what, what, how were they, what were they doing that they went from $2 million and then it stayed at $2 million? There was a lot of negotiating and discussing and when everything just sort of stayed the same. I'm not sure exactly how, well, I mean, even before the $2 million round, but I'm not sure how the negotiations of Greyhound went. Because I know we didn't start at $90,000. But what we have here, though, is an amount put on the table and then a suggestion that there was, you know, all sorts of back and forth, you know. But yet, the back and forth is, it's back where it was. It didn't really change. So I'm not sure I understand all of that. And I wish I could. In terms of it being negotiated. I understand you, Ira. But I think some of the, some of the talks also occurred before the $2 million was authorized. Sure, yes. And Mr. Esposito certainly pointed that out. And it looks like they began in earnest with the $2 million or something. And I know shortly before we arrived at our final settlement figure, the ruling was, came down regarding the barring the testimony of the minor due to noncompliance and a failure to sit for a deposition. So was that on the one count regarding the emotional distress? Yes. Now, that did not significantly change our position. In fact, you know, quite frankly, during the settlement conference following that, we've tested to the limit. That's one of the issues here, though, too, whether that was proper to the, to enter a sanction of that enormity. I understand. I'm sorry, Ira. I didn't mean to cut you off. No, you're not. I understand, but I, that was a factor taken into consideration. But because of that, our offer did not go down, but that also occurred in the interim. Well, since you raised that, Mr. Brancard, you know, didn't it seem that to you that there was maybe due to the issues related to, shall we say, competing plaintiff's lawyers that the initial response of the plaintiff's lawyers were, before we have her sit for a deposition, we want to have a current evaluation by a medical professional as to whether that would be too damaging to her as a minor to have to be asked to relive that. And that somehow, during the discussions with, that she had, the minor with Judge McGurry, who I, who was also involved at some point in this case, that the child apparently saw this whole issue as some type of an intimation that she was suffering from some mental illness and not that the discussion was whether it would be harmful for her to be asked to relive the circumstances in a deposition. And somehow, the request for a, an evaluation became seen as a refusal to produce her under any circumstances for the deposition by the judge who entered the sanction. Isn't that a fair representation of what occurred? I, I don't believe so, Your Honor. I believe that's, that's perhaps how the plaintiff would like the court to interpret it. Tell me where it's wrong, please. I believe every opportunity was afforded to the minor to have an evaluation. And there was a failure to obtain that evaluation. And that's, that's where, and the judge finally said enough is enough. You, at that point, the original plaintiff's lawyers had been removed. I believe you're correct, Your Honor. I, I, that, how the timing goes on that, on that point, I'm not sure, but I believe you're correct. But they, there was a, a opportunity again and again to get an evaluation. No evaluation was done. And in the final, on the, when the, before the final ruling came out, there was a in-camera meeting between the judge and the minor. For personal observations to be made. And it was. So that was a finding that she was competent, capable of testifying? Yes. Capable and there would be no harmful effects. I believe that's. Yeah. But that would be based on the judge deciding that? Or did the judge say that he had considered Leventhal's previous report and another doctor I thought that this would be harmful? Well, Your Honor, those were all taken into consideration. What I'm, what I'm pointing out is the fact that there was no final evaluation done. There were opportunities to have that evaluation done. There was a failure to, by the plaintiff, to afford, to, to, to obtain that. So what expert testimony was there to suggest that if the only, the only testimony that had, or rather report, standing, was that of an expert saying that this would not be, you know, professionally advisable or medically advisable for this minor? What, what changed other than the judge interviewing the young woman? Well, that report predated that by, again, at the time I don't have the, the number of years that, that, that last report predated that, that decision. But that, that came well before. And there was, again, attempts and attempts to obtain a, a deposition, which didn't go. And there were attempts to obtain a, some sort of evaluation that didn't occur. So. Anything further? No, Your Honor. Thank you. Thank you. Blanket. Thank you. I'll be as brief as I possibly can. Well, the abuse of discretion standard is what governs our review of whether or not to vacate or remove this settlement. I agree. And I would suggest to the court that because Mr. Cushing was excluded, it's void. And that is by definition an abuse of discretion. Let me, and I want to come back to that just for a second because of something Mr. Esposito said, which I think is kind of critical to this. What he said was, well, Mr. Cushing was still appointed by probate. He was still the probate appointed administrator. So he was entitled to attend. So I think that the 0768 case kind of settled that just because you're the probate administrator doesn't alleviate your responsibilities doesn't mean you can't be sidelined in the law division case. But if you think about that, what they're really saying is of course you have a right to attend these settlement conferences, which is not going to tell you when they are and it's sort of, which is essentially what the judge said. So if that was a right, I don't see what the right is. This might be backtracking, but going back to not the appointment of the guardian ad litem, Mr. Gubbins, but the appointment of Mr. Novoselsky and Mr. Cairo. Yes. Now, how did that occur again? It's a very good question. It just seemed to have happened as far as I know. Did Judge Locallo appoint them? Judge Locallo appointed them. So, now that is kind of an unusual situation, isn't it? I would certainly agree. For a court to be appointing, I mean, the guardian, I understand, but is it, I mean, I don't recall seeing anything sort of like this where the judge appointed the lawyers as opposed to perhaps, you know, after discharging the lawyers, then the actual parties would... Select their own place. ...seek and search out. Right. Right. I agree. I think that was a serious problem. In effect, the judge was firing parties' lawyers and he was hiring parties' lawyers, and I don't think that's appropriate. It's certainly not appropriate. It's certainly unusual. I'm not commenting in any way about its... The propriety? Yes, at this point, but I'm just... It is absolutely unusual. What, if nothing else makes it inappropriate, it's doing it without notices and hearings and an opportunity to be heard. I mean, that really, if a party's entitled to his or her own lawyers... Well, if Mr. Cushing truly was still in, then wouldn't it have been up to him to hire those lawyers? If he truly was put back into place, wouldn't it only be for Mr. Cushing to decide who those attorneys would be, if he really was him? Absolutely. Absolutely. And if the view was that he should not have been making those decisions, then under the wrongful death statute, they should have gone back to the probate division and brought a motion to have him fired and see if that could be done, which didn't happen. So I agree. I think that's exactly, and I think that sort of reinforces the point that he was out. Well, I'm not making any, and I don't want to suggest any opinions about this, case. I'm just asking questions about, you know, it's certainly something I don't think we see very often, but we also don't see the overturning of settlements that have been, you know... It's unusual, although I think in Glavinskas that took place because it was thought to be so egregiously unfair and wisely because it was not just the case, but because of the whole process and who was doing what in that case or not doing what. It was neglected by the original attorney that got to the settlement and so on and so forth. So there's not a lot of it, but there is some precedent for it. If I may, let me just correct a couple of things that I think are probably important to note. I think I disagree with Mr. Esposito. There still is a Wilson and Watton claim. Punitives are not. The punitives were gone, but the Wilson and Watton claim did remain in the last iteration of the complaint. I'm not sure this is terribly material, but at least in the trial court, NCI said that their sort of SIR was really one and a quarter million, not two million, so that the number that you would have had to get to to actually get a recovery with Grayhound's contribution would not have been four, but would have been somewhat less. Doesn't the fact that the punitives was gone change the value? It does change the value, yes, I agree, but it doesn't eliminate the value. Two other points on that. With respect to the removal of the attorneys, the timing is both unusual and important here because it was on September 3rd, 2009 that Judge Locallo, that and the first thing that happened, that was a Labor Day weekend, so the first thing that happened was essentially the next business day, he fired the lawyers. There were no interim hearings. There was nothing else that took place. The very first thing he did after that case got back to him was to fire the lawyers. And finally, sort of on behalf of Christina, fire the lawyers, exactly. I don't know if Judge Locallo had Shakespeare or the mug in front of him, but that's what happened. The last sort of factual correction I think that should be made, the other thing about the attorneys. I don't, Bill, I don't mean to make like what is a very serious case and with substantial issues, so if I suggested that. I did not take it that way. Well, I mean, to everyone who's out, we have quite an audience, a lot of many, many issues, and we're taking every one of them very seriously. And I appreciate it. And I'm sure all the lawyers in the parties in the case do as well. One other thing about the lawyers and the deposition of Ms. Stevens and so forth, I think the really telling fact here is that once she was removed, Greyhound never made an effort in the six, eight months or whatever until they settled, never made an effort to take her deposition. And that suggests to me that the removal was not because she really would have been an important witness. If she would have been, they would have acted on it. Finally, with respect to Christina's evaluation, she really didn't have opportunities to do that. What happened was that there was a push for her to have her deposition taken. And her probate appointed GAL, Ellen Douglas, had asked the trial court, well, at least let's get her evaluated before you issue orders about her deposition. Trial court did not issue an order requiring that. And as I said earlier, it was opposed by the court appointed GAL, Mr. Gubbins, and it was opposed by her court appointed attorney, Mr. Novoselsky. So just for the timing of that, I think the order insisting on her deposition without that was improper, but she really wasn't given that opportunity or certainly wasn't ordered to do it by the court. And if the court has no more questions for me, all I would say in conclusion is that, yeah, this case is kind of a mess. I think it was sort of hijacked and driven off a cliff. It can be saved. And I would hope that this court would do what's necessary to take that as far as possible. Thank you very much. We appreciate the arguments of counsel today and the matter will be taken under advisement. I also want to say thank you to all three lawyers. Thank you very much.